UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JAMES D. EMERY, | ) | CIV. 07-5038-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING |
| vs. | ) | PLAINTIFF'S MOTION FOR |
| | ) | PARTIAL SUMMARY |
| DAVE SCHNEIDER, individually | ) | JUDGMENT AND DENYING |
| and as mayor, and the | ) | DEFENDANTS' MOTION |
| CITY OF BELLE FOURCHE, | ) | FOR PARTIAL SUMMARY |
| SOUTH DAKOTA, | ) | JUDGMENT |
| | ) | |
| Defendants. | ) | |

        Plaintiff, James D. Emery, was the Superintendent of Public Works of the

City of Belle Fourche, South Dakota (the City) until he was terminated by

defendants. Emery alleges that defendants fired him because he filed a lawsuit

against the City seeking just compensation for a taking of his private property.

Emery contends that defendants violated his right to free speech, right to

petition the government, and right to pursue just compensation, as protected

by the First and Fifth Amendments to the United States Constitution. Emery

also alleges state-law claims for wrongful discharge and intentional infliction of

emotional distress. Both parties move for partial summary judgment on

Emery's constitutional and wrongful discharge claims. Both motions are

denied.

**BACKGROUND**

Emery has lived in or just outside the City for fifty years. Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment (PSUMF), Docket 23 ¶ 1. In 1993, he started Sandstone Water Company, a sole proprietorship that delivers potable water to customers in rural Butte County and in an area within three miles of the City. PSUMF ¶¶ 5-6. The City is governed by a mayor, currently defendant Dave Schneider, and an aldermanic council. Defendants' Objections to Plaintiff's Statement of Material Facts (DOPSMF), Docket 35 ¶ 3.

The relationship between Emery and the City began in September 2000, when Emery, d/b/a Sandstone Water Company, and the City entered into a Water Supply Agreement that permitted Emery to connect with the City's water supply main to provide water service to certain rural residents outside of the City limits. DOPSMF ¶ 8. The parties amended the Water Supply Agreement in 2004 to permit Emery to construct and install a water main connected to the City's water main. PSUMF ¶ 22; Docket 28-17 at 1.

In 2002, the relationship between Emery and the City took on an employee-employer dimension when Emery successfully applied for the position of Superintendent of Public Works[1] with the City. PSUMF ¶ 9. The

_____

[1] The parties refer to Emery's position with the City by different names, including Public Works Supervisor, Public Works Director, and Public Works Superintendent.

City was aware of his ownership interests in Sandstone Water Company at the time he was hired. DOPSMF ¶ 10. Emery began work on September 10, 2002, and his duties included supervising the facilities, materials, equipment, and personnel in the City's parks department, water department, landfill department, streets department, city shop, round-up grounds, sewer, and lagoons. PSUMF ¶¶ 11-12. He had no role in the City's decisions regarding annexations or takings of private land. DOPSMF ¶ 18. Sandstone Water Company occasionally did work for the City during the period in which Emery served as Superintendent of Public Works. PSUMF ¶ 23.

Emery consistently received positive appraisals of his performance as Superintendent of Public Works. In 2002, Emery's department head rated Emery as competent or highly effective in every performance factor category, commenting that he was "very conscientious [and] always figuring out what is best for the City." Docket 28-26 at 12-17. In 2003, then-Mayor Todd Keller rated Emery as highly effective or outstanding in every category. Docket 28-26 at 6-11. In 2004, Keller gave Emery an "excellent" rating in every rating category and commented that his ideas were in the best interest of the City. Docket 28-26 at 4-5. On December 13, 2006, Schneider rated Emery at above average or excellent in every category. Schneider also commented, "[Emery] has a terrific attitude and knowledge and gut sense about keeping this

[department] up and running.  We are fortunate to have him in place."  Docket

28-26 at 2-3.

This lawsuit arises out of negotiations between the City and Emery,

d/b/a Sandstone Water Company, over the sale of a portion of Emery's water

main.  On December 8, 2005, the City offered to purchase a portion of Emery's

water main in order to serve customers on soon-to-be-annexed land.  Docket

28-8.  The City indicated that under South Dakota law it could pay no more

than the actual cost of constructing the water line.  Docket 28-8.  City

Engineer Terry Wolterstorff, P.E., estimated that the total cost of Emery's water

main was $48,963.20.  Docket 28-8 at 6.  Pursuant to advice from his attorney,

Emery obtained two estimates of the value of his water main.  Schreier[2]

Engineering estimated that the water main was worth $180,300, and Wayne

Eaton (EMC Development, LLC) estimated that it was worth $116,162.70.

PSUMF ¶¶ 28-29.  In a letter dated April 17, 2006, Emery informed the City

that he would not accept $24,650 in compensation for the first phase of the

construction of the water main.  He also indicated that he considered the City's

attempt to buy Emery's water main in order to service new customers in

Emery's territory to be a breach of the Water Supply Agreement, and that he

---

[2] The court is unaware of any familial relationship between her and
Schreier Engineering.

4

believed the annexation of the new areas was invalid under South Dakota law. Docket 28-20.

On June 6, 2006, the City and Emery, d/b/a Sandstone Water Company, entered into an Agreement for the Transfer of Water Main and Preservation of Claims (the Agreement). The Agreement referenced unresolved disputes between Emery and the City regarding the City's authority to supply water to the newly-annexed area, the City's right to acquire Emery's water main, the amount of compensation owed for Emery's water main, and Emery's status as a water supplier. Docket 28-17 at 2. The Agreement provided that Emery would transfer about 2,000 feet of water main to the City, but that the parties reserved any and all rights, claims, or defenses regarding the water main and would resolve their disputes through negotiation, litigation, or alternative dispute resolution. Docket 28-17 at 2-3.

Apparently unable to resolve his conflicts with the City by negotiation or alternative dispute resolution, Emery, d/b/a Sandstone Water Company, filed suit against the City on September 28, 2006. See Docket 35-11. He alleged breach of contract, requested a declaration of unlawful annexation, and alleged inadequate compensation, claiming that his water system was a rural water system governed under SDCL 9-47-22 and 9-47-23. The City counterclaimed on October 31, 2006, requesting that the court declare the rights, status, and legal relations of Emery, d/b/a Sandstone Water Company, and the City under

5

SDCL 9-47 and determine the amount of compensation owed by the City.  <u>See</u>

Docket 28-5.  Emery replied to the City's counterclaim on November 8, 2006.

<u>See</u> Docket 28-6.

On December 26, 2006, about two weeks after Schneider rated Emery at

above average or excellent in every performance category for his work as

Superintendent of Public Works, Emery moved for partial summary judgment

on the issues of whether his water system was a rural water system governed by

SDCL 9-47-22 and 9-47-23 and whether the annexations in question were

lawful.  <u>See</u> Docket 28-7.

Three weeks later, on January 16, 2007, Schneider terminated Emery

from the position of Superintendent of Public Works pursuant to the power

given to him in SDCL 9-14-13.[3]  PSUMF ¶ 43.  Before doing so, Schneider spoke

with Milo Daily, editor of the local newspaper, and gave him the reasons for

Emery's termination.  PSUMF ¶ 44.  In the January 17, 2007, issue of the local

newspaper, actually distributed in the evening of January 16, 2007, Schneider

was quoted as saying, "I cannot in good conscience, allow a mayoral appointee

---

[3] SDCL 9-14-13 provides:

In an aldermanic-governed first and second class municipality the
mayor shall have power except as otherwise provided to remove
from office any officer appointed by him, whenever he shall be of
the opinion that the interests of the municipality demand such
removal, but he shall report the reasons for his removal to the
council at its next regular meeting.

to continue as a city department head while suing the city." PSUMF ¶¶ 45-46.
Although Schneider acted with the blessing of the City Council, it was his
decision to terminate Emery, and he carried out the termination himself.
PSUMF ¶¶ 48, 51.

Schneider testified that he terminated Emery because it was in the best
interest of the community. Defendants' Material Facts (DMF), Docket 35 ¶ 77.
He believed that Emery had a conflict of interest, exhibited by Emery's assertion
that the City could not serve the newly-annexed areas and by the exorbitant
amount (in Schneider's assessment) that Emery demanded for his water line.
Schneider Deposition, Docket 28-3 at 13-14. Schneider believed that Emery
was in a position that allowed him to use his employment with the City to
benefit his private business. DMF ¶ 83. Schneider indicated that the City
Council had discussed several times how Emery was hired in the first place
given an apparent or potential conflict of interest. DMF ¶ 80. These
discussions began in executive session meetings in the summer of 2006, before
Emery filed his lawsuit. DMF ¶ 91. Emery's termination became a higher
priority for Schneider and the City Council after he filed his lawsuit. PSUMF
¶ 56.

Defendants also allege that Emery misrepresented the costs he incurred
for constructing his water main in the estimates he submitted to the City.
Wolterstorff estimated that the cost of the first phase of the water main was

$16,991, while Emery provided an estimate of $51,180 for the same section. Wolterstorff Affidavit, Docket 37 ¶¶ 15-16. Wolterstorff determined that Emery's estimate was based on a backhoe trench and engineered-fill method of construction, but that he had personally observed Emery using a less costly method of construction. Wolterstorff Affidavit ¶¶ 19-23. Wolterstorff concluded that the "misinformation" in Emery's estimate contributed to the approximately $34,000 difference in estimates. Wolterstorff Affidavit ¶ 23. Wolterstorff indicated that he presented his findings to the City Council. Wolterstorff Affidavit ¶ 24. Schneider testified, however, that he did not remember seeing the estimates Emery provided to Wolterstorff or discussing these estimates with the City Council. Schneider Deposition at 38-43. Further, Schneider testified that the estimates submitted by Emery were not the documents he was referring to as exorbitant and had nothing to do with the lawsuit. Schneider Deposition at 43-44.

Defendants also assert that Schneider and the City Council considered and evaluated twenty-five documents or matters in deciding to terminate Emery's employment. DMF ¶ 94. Schneider testified, however, that the following matters did not play a role in his decision to terminate Emery: Emery's statements about purchasing property to the east of the City in order to take advantage of future expansion of the City (Schneider Deposition at 67-69), problems with Emery's performance of City contracts before his employment

with the City (Schneider Deposition at 70-71), Emery's use of City equipment to store and transport materials for Sandstone Water Company and handling of private business in the course of his employment with the City (Schneider Deposition at 72-74), Emery's access to City infrastructure while owning a water utility that competed with the City (Schneider Deposition at 72), the tactics Emery used in negotiating the purchase price for his water main (Schneider Deposition at 76-77), Emery's ability to convert information gained through his employment with the City for personal benefit (Schneider Deposition at 77), and invoices relating to the Water Supply Agreement when it was first negotiated (Schneider Deposition at 82).

Further, Schneider testified that he was aware of discussion among the members of the City Council regarding Emery's comments about his privately-owned water company being his "retirement plan" and his lack of interest in working for the City if his water company became an issue, public complaints about Emery's perceived conflict of interest, and Emery's efforts to prevent the City from growing, but did not testify that these statements or situations contributed to his decision to terminate Emery. Schneider Deposition at 69-70, 72, 77-78. Schneider testified that Emery was doing his job exceptionally well, and that his job performance was separate from the reasons he was terminated. PSUMF ¶ 53.

The dispute between Emery and the City regarding the sale and purchase price of his water main continued after Emery was terminated. On August 7, 2007, a state court judge granted partial summary judgment in favor of the City, ruling that Emery's water system was a private water system and governed as such under South Dakota statutes. Docket 37-10. In October 2007, the parties settled Emery's state-court lawsuit. <u>See</u> Docket 28-19. The City agreed to pay Emery $110,000 in order to settle the lawsuit and to purchase the water main. DMF ¶ 89. According to Schneider, the City Council believed that $110,000 reflected the value of the water main as well as the value of ending the litigation, and not the value of the water main alone. Schneider Deposition at 50-51. The settlement agreement recognized "Emery's right to receive compensation for the City's acquisition of Emery's property and property rights, the avoidance of unnecessary legal expense, and the City's interest in saving taxpayer money." Docket 28-19 at 1.

On May 18, 2007, Emery brought the present lawsuit, alleging that the City and Schneider violated his First and Fifth Amendment rights, wrongfully discharged him in violation of public policy, and intentionally inflicted emotional distress against him. Docket 1.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

I.    **Section 1983–First Amendment Retaliation**

Emery claims that he was terminated in retaliation for suing the City.  He

argues that his termination violated his rights of free speech, to petition for

redress of grievances, and to pursue just compensation.[4]  Emery admits that

the alleged violation of his Fifth Amendment right to just compensation is

encompassed by his First Amendment claims.  Further, "[t]he right to petition

the government . . . is analyzed the same as the right to free speech." <u>Gunter v.</u>

<u>Morrison</u>, 497 F.3d 868, 872 (8th Cir. 2007).  With respect to the right to free

speech, "[i]t is well settled that 'a State cannot condition public employment on

a basis that infringes the employee's constitutionally protected interest in

freedom of expression.' " <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 413, 126 S. Ct.

1951, 164 L. Ed. 2d 689 (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 142, 103 S.

Ct. 1684, 75 L. Ed. 2d 708)).

_____

[4] Emery brings his First Amendment retaliation claim under 42 U.S.C. § 1983.  To prevail under Section 1983, he must show that (1) defendants acted under color of state law, and (2) the alleged wrongful conduct deprived him of a constitutionally protected federal right.  <u>Mann v. Yarnell</u>, 497 F.3d 822, 825 (8th Cir. 2007).  Defendants have not contested that they acted under color of state law and they do not dispute Emery's contention that the City is liable on the basis of Schneider's status as a final policymaker.  <u>See</u> Plaintiff's Brief in Support of Summary Judgment, Docket 29 at 8-10.  As a result, the court need only address whether Emery has satisfied the requirements for First Amendment retaliation.

To establish his First Amendment retaliation claim, Emery must prove that he "engaged in protected activity and that this activity was a substantial or material factor in [his] employer's decision to take an adverse employment action." Altonen v. City of Minneapolis, 487 F.3d 554, 559 (8th Cir. 2007). Then, the burden shifts to defendants to demonstrate that they would have taken the same action regardless of Emery's First Amendment activities. Id.

In determining whether Emery's speech was protected, the court must determine whether his speech addressed a matter of public concern, and if so, balance his right to free speech against the interests of the City. Gunter, 497 F.3d at 872. "Matters of public concern include matters of political, social, and other concern to the community." Lindsey v. City of Orrick, Mo., 491 F.3d 892, 898 (8th Cir. 2007). When the employee's speech concerns matters of both public concern and personal interest, the court must determine whether the employee was speaking primarily as a concerned citizen or as an employee. Bailey v. Dep't of Elementary & Secondary Educ., 451 F.3d 514, 518 (8th Cir. 2006). "If the speech was mostly intended to further the employee's private interests rather than to raise issues of public concern, [his] speech is not protected, even if the public might have an interest in the topic of [his] speech." Id. "[W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." Gunter, 497 F.3d at 872 (internal quotation omitted).

If an employee's speech concerns a matter of public concern, then the court must "balance 'the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interests of the employer, in promoting the efficiency of the public services it performs through its employees.' " Belk v. City of Eldon, 228 F.3d 872, 880 (8th Cir. 2000) (quoting Pickering v. Bd. of Educ. of Tp. High School Dist. 205, Will County, Ill., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).  Factors relevant to the Pickering balancing test are whether the speech creates disharmony in the workplace, impedes the employee's ability to perform his duties, or impairs working relationships with other employees.  Sexton v. Martin, 210 F.3d 905, 911 (8th Cir. 2000).  The balancing test takes proportionality into account.  That is, "the closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it can be punished."  Id. at 912.

But, in order to put the Pickering balancing test at issue, the public employer must produce evidence that the speech had an adverse impact on the efficiency of the employer's operations.  Lindsey, 491 F.3d at 900.  Mere allegations of disruption are insufficient.  Belk, 228 F.3d at 881.  If the public employer does not, with specificity, demonstrate that the speech at issue created workplace disharmony, impeded the employee's performance, or impaired working relationships, there are no government interests in efficiency

to weigh against the First Amendment interests, and the court need not engage in the Pickering balancing test.  Lindsey, 491 F.3d at 900.

The record as a whole reveals that Emery's speech, i.e., the filing of the lawsuit against the City, addressed a matter of public concern.  With respect to content, the lawsuit raised issues of concern to the community, including the right of the City to supply water to residents living in newly-annexed areas, the right of the City to annex areas of land that are not contiguous with the City boundaries, the amount of compensation the City must pay for property it acquires from private citizens, and the ability of a citizen to hold the City accountable for breach of a contract.  The form of Emery's speech, a lawsuit, is the most formal method of speech.  See Gunter, 497 F.3d at 872.  The context of Emery's speech is a public dispute over the power of the City to annex land and acquire the private property of residents.  Indeed, Schneider spoke about Emery's lawsuit to the local newspaper shortly before terminating him.  All of these facts show that Emery's lawsuit addressed a matter of public concern. See id. (finding lawsuit by employee of city utilities department regarding city's denial of building permit on employee's privately-owned land addressed a matter of public concern).

Defendants argue that Emery's speech was primarily motivated by private concern, and is therefore unprotected even though the public might have an interest in the topic of his speech.  While it is true that Emery's lawsuit related

both to his private interest in receiving just compensation for his water main and the public interests set out above, the court finds that the speech was primarily motivated by public concern. Emery's speech is distinguishable from the speech found to be primarily motivated by private concern in <u>Altonen v. City of Minneapolis</u>. There, the public employee filed a lawsuit to obtain access to a human resources investigative file concerning allegations against her. <u>Altonen</u>, 487 F.3d at 557. The Eighth Circuit found that her lawsuit was not protected speech because "her primary motivation was her personal interest in obtaining access to her files, not to provide the public with information." <u>Id.</u> at 559-60.

In contrast, Emery filed a lawsuit as a private citizen (doing business as Sandstone Water Company) challenging actions of the City and seeking just compensation from the City in matters unrelated to his employment with the City. Emery did not speak "*as an employee* upon matters only of personal interest," <u>Connick</u>, 461 U.S. at 147 (emphasis added), but rather as a private citizen upon the power of the City to annex new land, the amount of compensation the City must pay for property—that it would use to provide water to some of its citizens—acquired from a private individual, and the identity of the company or government entitled to supply water to certain areas of newly-annexed land. Emery undeniably wanted to protect his financial interest in his water main, but this fact does not change that his primary motivation in suing the City was to resolve issues of public concern. In this

context, the court finds that Emery's speech was primarily motivated by public concern.

Next the court must determine whether defendants produced evidence that Emery's lawsuit had an adverse impact on the efficiency of the City's operations, and if so, balance Emery's interest in commenting upon matters of public concern and the City's interests in promoting the efficiency of its operations.  See Lindsey, 491 F.3d at 900; Belk, 228 F.3d at 880.  Defendants argue that Emery's lawsuit disrupted the efficiency of the City's operations because his business began to compete with the City over who could supply water to the newly-annexed areas and because the lawsuit required Schneider and the City Council to hold several executive sessions.  Even if defendants' allegations are taken as true, the court finds that they do not provide sufficient evidence of workplace disruption to bring the Pickering factors into play.

Defendants have not shown that Emery's lawsuit created workplace disharmony, impeded his performance, or impaired his working relationships with employees in his department, Schneider, or members of the City Council. Indeed, the undisputed facts show that Schneider gave Emery strong reviews for his work as Superintendent of Public Works over one year after the City and Emery, d/b/a Sandstone Water Company, began negotiating the sale of Emery's water main and over two months after Emery filed suit against the City. Defendants' allegation that Emery had a conflict of interest does not show that

the alleged conflict of interest created workplace disharmony or impaired Emery's working relationships. Moreover, the fact that the City Council went into executive session several times to discuss Emery's lawsuit does not rise to the level of disruption because defendants have not alleged that these executive sessions impeded the City Council's efficiency. See Lindsey, 491 F.3d at 900-01 (defendant failed to allege sufficient disruption to trigger Pickering where employee argued with mayor and city council members at four public meetings). Defendants also have not alleged that the fact that Emery brought suit as a private citizen while simultaneously serving as a public employee created any greater disruption to the City than a similar lawsuit brought by any other private citizen. Defendants have provided only mere assertions of disruption, which are insufficient to put the Pickering balancing test at issue. See Belk, 228 F.3d at 881. As a result, the court finds that, as a matter of law, Emery's lawsuit against the City was protected First Amendment activity.

Because Emery has established that his lawsuit was protected, he must show that it was a "substantial, motivating factor" in Schneider's decision to terminate him. See Altonen, 487 F.3d at 560. To avoid liability, defendants must demonstrate that Schneider would have taken the same action regardless of Emery's protected activity. Altonen, 497 F.3d at 560-61. These questions are typically questions of fact for the jury. Buzek v. County of Saunders, 972 F.2d 992, 995 (8th Cir. 1992).

Emery has alleged sufficient facts from which a reasonable jury could find that his lawsuit was a substantial, motivating factor in Schneider's decision to terminate him. Schneider told the editor of the local newspaper that he could not "allow a mayoral appointee to continue as a city department head while suing the city." This statement provides direct evidence that Emery's lawsuit was a motivating factor in Schneider's decision. Further, the temporal proximity between Emery's protected First Amendment activity and his termination contributes to establishing that the activity was a substantial, motivating factor in that decision. See Davison v. City of Minneapolis, Minn., 490 F.3d 648, 657 (8th Cir. 2007). Emery began working for the City in 2002. The City was aware of his ownership interests in Sandstone Water Company, an entity with which the City had contractual relations, at the time Emery was hired. The City first offered to purchase Emery's water main in December 2005, and the parties reached an initial agreement in June 2006. Emery filed his lawsuit in September 2006. In December 2006, Schneider gave Emery a strong performance evaluation and indicated that the City was "fortunate to have him in place." Two weeks later, Emery moved for partial summary judgment. Three weeks after that, he was fired. The court finds that Emery's strong employee performance record in combination with the fact that he was fired within four months of filing the lawsuit and within three weeks of filing a dispositive motion is sufficient to allow a reasonable jury to infer a causal link between Emery's

lawsuit and termination.  See id.  Emery has created a genuine issue of material fact as to whether his termination was substantially motivated by the filing of the lawsuit, precluding summary judgment in favor of defendants on his retaliation claim.

For their part, defendants have produced sufficient evidence from which a reasonable jury could find that Schneider would have terminated Emery regardless of his lawsuit.  Schneider testified that he terminated Emery because Emery's private company created a conflict of interest.  There is evidence that Emery informed the City that Emery, d/b/a Sandstone Water Company, had the exclusive right to provide water to the residents of the newly-annexed areas. There is also evidence that Emery's construction cost estimates were considerably higher than the estimates calculated by Wolterstorff, and that Emery's estimates contained misrepresentations of fact.  The City has created a genuine issue of material fact as to whether Schneider would have terminated Emery in the absence of his protected activity.  Because there are genuine issues of material fact in favor of both parties, neither party is entitled to judgment as a matter of law on Emery's First Amendment retaliation claim.

## II.     Wrongful Discharge–Violation of Public Policy

Emery claims that he was wrongfully discharged in violation of public policy.  South Dakota is an employment at will state.  Johnson v. Kreiser's, Inc., 433 N.W.2d 225, 227 (S.D. 1988).  That is, "an employment having no specified

term may be terminated at the will of either party . . . ." Id. (quoting SDCL 60-4-4).  The harsh effects of the at will employment doctrine have been tempered by South Dakota's adoption of the public policy exception.  Dahl v. Combined Ins. Co., 621 N.W.2d 163, 166 (S.D. 2001).  An employee has a cause of action for wrongful discharge "where an employer's motivation for termination contravenes a clear mandate of public policy."  Id.  The South Dakota Supreme Court has recognized a cause of action for employees under the public policy exception for (1) termination for refusing to commit a crime, (2) termination in retaliation for filing a worker's compensation claim, and (3) termination in retaliation for whistleblowing that serves a public purpose.  Id. at 166-67.  Emery urges this court to recognize a fourth public policy exception to the at will employment doctrine for termination in retaliation for exercise of the First Amendment rights to petition the government for redress of grievances and freedom of speech.

To state a cause of action of wrongful discharge under the public policy exception, "the employee must plead and prove that a substantial public policy may have been violated."  Id. at 167 (quoting Niesent v. Homestake Mining Co. of California, 505 N.W.2d 781, 783 (S.D. 1993)).  Whether a termination violates a clear mandate of public policy is a question of law.  Niesent, 505 N.W.2d at 783.  The primary sources of public policy declarations in South Dakota are the constitution, statutes, and judicial decisions.  Johnson, 433 N.W.2d at 227.

Once the employee shows that a substantial public policy may have been violated, "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." Johnson, 433 N.W.2d at 227.  Then, "[t]o prevail, the employee must prove by a preponderance of the evidence that the discharge was for an impermissible reason." Id. at 227-28.

The South Dakota Constitution and state judicial decisions express a strong public policy in favor of safeguarding the rights to free speech and to petition the government for redress of grievances, especially with respect to government takings of private property.  With respect to freedom of speech, the South Dakota Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." S.D. Const. art. VI, § 5.  On the right to freedom of expression in the First Amendment of the United States Constitution, the Supreme Court of South Dakota has said, "[t]he First Amendment protects speech even if biased or improperly motivated.  If freedom of speech insulated comments only from those whose motives were pure, it would protect very little." State v. Springer-Ertl, 610 N.W.2d 768, 771-72 (S.D. 2000) (internal citation omitted).  Similarly, with respect to the right to petition the government for redress of grievances, the South Dakota Constitution provides, "[t]he right of petition . . . shall never be abridged." S.D. Const. art. VI, § 4.  The Supreme Court of South Dakota has characterized the federal version of this "fundamental right" as "one of the most

precious liberties safeguarded by the Bill of Rights." <u>Hobart v. Ferebee</u>, 692

N.W.2d 509, 514 (S.D. 2004) (internal quotation omitted). Like the right to free

speech, "[t]he right to petition the government does not hinge on an individual's

motivation." <u>Id.</u>

South Dakota courts have expressed a strong public policy in favor of

protecting the rights to free speech and to petition the government for redress of

grievances, even when exercised for biased or improper motives, but the court

need not decide whether these rights alone form substantial public policy. The

subject matter of Emery's lawsuit against the City raised another issue of public

policy, the right to pursue just compensation for governmental takings of

private land.[5] Under the South Dakota Constitution, "[p]rivate property shall

not be taken for public use, or damaged, without just compensation, which will

be determined according to legal procedure established by the Legislature and

according to § 6 of this article [providing for the right of trial by jury in all

cases]." S.D. Const. art. VI, § 13. This constitutional provision "is

unquestionably a wise and just one . . . and should be given a liberal

construction by the courts, in order to make it effectual in the protection of the

---

[5] Although the City did not exercise its power of eminent domain to take
Emery's water main, it is clear from the record that the City would have
condemned Emery's water line if the parties had not reached an agreement for
voluntary transfer.

rights of the citizen." Krier v. Dell Rapids Twp., 709 N.W.2d 841, 846-47 (S.D.

2006) (quoting Searle v. City of Lead, 73 N.W. 101, 103 (S.D. 1897)).

The court finds that South Dakota has articulated a substantial public

policy in favor of protecting the rights to freedom of speech and to petition the

government for redress of grievances when a citizen seeks to use these rights to

seek just compensation for property taken by the government.[6]  Because Emery

has alleged sufficient facts from which a reasonable jury could find that he was

terminated in retaliation for bringing a lawsuit to secure just compensation, as

discussed in Section I, the court finds that defendants are not entitled to

summary judgment on this claim.  Likewise, because defendants have alleged

sufficient facts from which a reasonable jury could find that Emery was

terminated for reasons other than the lawsuit and that the discharge was for a

permissible reason, Emery is not entitled to summary judgment on this claim.

---

[6] Defendants urge the court to find that South Dakota public policy
favors unfettered removal power in the mayor.  While mindful that the South
Dakota legislature has given the mayor of an aldermanic-governed first or
second class municipality the power to "remove from office any officer
appointed by him, whenever he shall be of the opinion that the interests of the
municipality demand such removal," SDCL 9-14-13, the court finds that the
mayor's removal power must be exercised within the confines of the state and
federal constitution.  See Levasseur v. Wheeldon, 112 N.W.2d 894, 895 (S.D.
1962) (finding that city governments are subject to constitutional and statutory
restraints).  Because the mayor's removal power is constrained by the state and
federal constitutions, the court finds that South Dakota public policy favors the
constitutional rights of freedom of expression, freedom to petition the
government, and right to just compensation over the power of the mayor to
remove appointed officers.

Accordingly, is hereby

ORDERED that plaintiff's motion for partial summary judgment (Docket 22) is denied.

IT IS FURTHER ORDERED that defendants' motion for partial summary judgment (Docket 24) is denied.

Dated January 30, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE